*In the matter of the Estate of* WILLIAM RENWICK, *deceased.*

A claim for the mesne profits of lands occupied by the intestate may be allowed out of the proceeds of his real estate, sold for the payment of his debts.

It is competent on the sale of real estate, for the payment of the debts of the deceased, or on the distribution of the proceeds, to offer any equitable defence against the claims of a party alleging to be a creditor; and the heirs are not restricted to a legal defence.

The common-law action of trespass for mesne profits was not abolished by the Revised Statutes. Trespass being an action for a tort, died with the party defendant, and did not survive against his executor or administrator.

It is, however, provided by statute that for wrongs done to the property, rights, or interests, of another, for which an action might be maintained against the wrong-doer, an action may be brought after his death against his executors or administrators, in the same manner, and with the like effect, as actions upon contracts.

An action for use and occupation lies only where the relation of landlord and tenant has existed, founded on some agreement, express or implied. The Revised Statutes have transformed the claim for mesne profits, consequent on a recovery in ejectment, into a proceeding in the nature of an action for use and occupation. Mesne profits can only be recovered for a period of six years previous to the commencement of the action. The term of eighteen months is not deemed any part of the time limited by law for the commencement of actions against an administrator or executor. In a proceeding for the sale of real estate for the payment of debts, the Surrogate may award a feigned issue.

> H. M. WESTERN, *for Claimant.*
> JOSEPH BLUNT, *for Heirs.*
> W. S. SEARS, S. M. WOODRUFF, G. C. GODDARD, *for Creditors.*

THE SURROGATE.—On the distribution of the proceeds of the sale of the real estate of the intestate, for the payment of his debts, a claim is interposed by Duncan P. Campbell for the mesne profits of Macomb's dam, alleged

to have been in the possession of William Renwick, at and previous to the time of his death.

This property consists of two parcels, as to one of which it does not sufficiently appear that the intestate was in possession, claiming title in his own right. · He seems to have acted as agent for James Renwick, and it is therefore unnecessary to enter into the consideration of the title.

The other portion belonged to Robert Macomb, who, with his wife, executed to Campbell, as treasurer of the Protestant Episcopal Charity School, two mortgages for $5,000 each,—one dated 31st August, 1815, and recorded 25th September, 1815 ; the other dated 19th December, 1815, and recorded 26th December, 1815. These mortgages were regularly foreclosed ; and Campbell, having become the purchaser at the sale, received the master's deed, dated 31st December, 1822, and recorded 8th February, 1823.

The counsel for the heirs have. set up in opposition to this claim, title in the intestate, under a sheriff's deed, or rather a deed executed by the executors of Jared L. Bell, former sheriff of New York, dated March 9, 1831. It is not requisite that I should discuss the questions arising under this instrument, as the deed only purports to convey the title which Robert Macomb had October 28, 1817— the date of the judgment against Macomb, to satisfy which the sale was made. The title of Campbell, under the master's deed on the foreclosure of the mortgages executed in 1815, is clearly superior.

But it is contended on the part of the heirs, that there are equitable considerations which should debar the claimant from a recovery. It appears that in November, 1826, it was proposed to form an association denominated " The New York Hydraulic Manufacturing and Bridge Company," for the management of property at Macomb's Dam, and adjacent thereto. The lands were valued at $100,000, and the stock was divided into one thousand shares. Campbell subscribed for four hundred, Mrs. Macomb by her trustee,

James Renwick, for three hundred, and other parties for two hundred and sixteen. The lands were to be conveyed to Campbell and James I. Rosevelt in trust for the shareholders, and they included that part of Macomb's Dam which constitutes the premises now in question. Mr. Campbell was at that time owner of this part, under the master's deed, on the sale in foreclosure, 31st December; 1822. This was to form part of the property of the association; all the rest of the lands belonged to Mrs. Macomb. A deed was accordingly executed by Robert Macomb, and Mary his wife, and James Renwick, her trustee, to Duncan P. Campbell and Philip Rhinelander, as joint tenants, embracing all the several parcels designed to constitute the capital of the Hydraulic Manufacturing and Bridge Company. This instrument was acknowledged towards the close of July, 1827. As Mr. Campbell had at that time demands to a large amount existing against Mr. Macomb, then amounting, as appears by an account stated, to over $40,000, it was agreed, on the 1st August, 1827, that the account should be liquidated, and finally settled, at forty thousand dollars, "payable in the stock of the New York Hydraulic Manufacturing and Bridge Company, at par, agreeably to their articles of association." This amounted to the value of the four hundred shares of the stock subscribed for by Mr. Campbell. On the 2d of August, 1827, he acknowledges the receipt of four hundred shares of the stock in full payment of the account.

Now, the account thus settled includes charges covering the same bonds and mortgages, on the foreclosure of which Campbell acquired title to the parcel of land contributed by him to the capital of this company; and it is therefore argued that those mortgages were paid, and the title acquired under the foreclosure and master's deed, was equitably discharged or released for the benefit of Macomb and wife.

On the credit side of the account stated between Macomb and Campbell, appears a credit to Macomb on account of " Harmanus Bouck's bond and mortgage, accepted

at $10,000." This bond and mortgage appear to have been transferred by Macomb to the treasurer of the New York Protestant Episcopal Public School, as treasurer of which institution Campbell originally received the two mortgages of Macomb on the property in question. And on December, 21st, 1830, Campbell requested the treasurer of that institution to acknowledge satisfaction of those mortgages, stating that the entire balance due thereon had been satisfied by means of the securities against Harmanus Bouck assigned to the treasurer.

The point, then, is whether Campbell's legal title, under the master's deed, has been equitably affected by the subsequent transactions in relation to the mortgages so foreclosed. I think not. There can be no reasonable doubt that Campbell designed to receive the four hundred shares of stock as an agreed valuation of his land, and as a liquidation of the sum due him by Macomb. And perhaps such an effect should in equity be given to his acts, that his title should enure to the benefit of all the parties interested in the company, according to the shares and interests of the respective stockholders. But, for some cause or other, probably from inability to effect the incorporation of the company, the objects of the parties were never carried out, and the association never went into operation. To hold, therefore, that his title to the land to be contributed by him, was lost by virtue of dealings which failed in their design, and were ineffectual to the accomplishment of the general end proposed, would not be just and reasonable. It may be, that by virtue of the deed to Campbell and Rhinelander, as joint tenants—whereby Macomb and wife and Renwick conveyed all the lands intended as the capital of the company, among which was the very parcel to which Campbell was entitled under the master's deed—Campbell is estopped from setting up his title against the parties who were shareholders in the company. As against strangers, however, or as against parties claiming against the company, he is not estopped. Although, therefore, under the

deed to him and Rhinelander, in joint tenancy, he may be a trustee for the benefit of the shareholders, and cannot set up his own title against them; yet strangers have no equity tending to impair the full legal title vested in him under the master's deed. I am, therefore, of opinion, he has established his title to this parcel of property, though the recovery may enure to the benefit of the shareholders of the contemplated company.

With this view of the validity of the claimant's title to the real estate in question, it becomes necessary to consider whether he can establish any legal or equitable debt against the estate of William Renwick, by reason of Renwick's occupation of the premises. The mode of recovering damages in such a case, at common law, was by the action of trespass for mesne profits. This action was not abolished by the Revised Statutes (2 *R. S.*, 3*d ed.*, *p.* 406, § 45), the provisions of which, on this subject, apply only to mesne profits the right to which results from a recovery in ejectment. (*Leland* vs. *Tousey*, 6 *Hill*, 328.)

Campbell brought ejectment against Dingee, Renwick's tenant, in April, 1845, and verdict was rendered in that case in October, 1849. The recovery therein will relate to the time title was acquired, and form the basis of such a possession as would enable the plaintiff to bring trespass against all other wrong-doers. (6 *Hill*, 332.) Trespass being an action for a tort, by the rule of the common law died with the party, and did not survive against his executor or administrator. (1 *Saunders*, 216, *notes, d.* (1); 1 *Chitty*, *Pl.* 79, 225.) Our statute, however, provides, that for wrongs done to the property, rights, or interests of another, for which an action might be maintained against the wrong-doer, such action may be brought by the person injured, or, after his death, by his executors or administrators, against such wrong-doer, and *after his death, against his executors or administrators, in the same manner and with the like effect in all respects as actions*

*founded upon contracts.* (2 *R. S.*, *3d ed.*, *p.* 543, § 1 ; *See Revisers' notes*, 3 *R. S.*, *2d ed.*, *p.* 781.)

It is said also, that the tort may be waived, and the mesne profits recovered, in an action for use and occupation. This is true only where the relation of landlord and tenant has existed, founded on some agreement, express or implied. There is nothing from which to infer that relation in this case ; but, on the contrary, the possession of Renwick seems to have been entirely disconnected from the title of Campbell. There was no privity between the parties. (*Feathers-tonhaugh ads. Bradshaw*, 1 *Wendell*, 134 ; *Smith* vs. *Stewart*, 6 *J. R.*, 46.) Besides, the former rule was, that when the plaintiff had brought ejectment he could recover for use and occupation only for the time previous to the day of the demise laid in the ejectment, having, by bringing that action, elected to consider the possession tortious. This would lead to the limitation of the claim for mesne profits to a period antecedent to April, 1845, when the ejectment suit was brought. It might be a question, however, whether this rule would any longer prevail, as the Revised Statutes have transformed the claim for mesne profits con-sequent on a recovery in ejectment, into a proceeding in the nature of an action for use and occupation. (2 *R. S.*, *3d ed.*, *pp.* 406, 407, §§ 46, 47, 54.) But it is unnecessary to pursue that question, as the statute gives an ample remedy for a wrong of this kind, against the estate of the wrong-doer.

In an action for use and occupation, or trespass for mesne profits, no more than six years' rent of the premises can be recovered. (2 *R. S.*, *3d ed.*, *p.* 407, § 51.) The commencement of the action determines the period. William Renwick died August 31, 1847. The term of eighteen months after his death is not deemed any part of the time limited by law for the commencement of actions against his administrator. (2 *R. S.*, *3d ed.*, *p.* 544, § 8.) The claimant is entitled, therefore, to the mesne profits for

about three years and ten months, not having prosecuted his claim until May, 1851.

As to the amount of the rent, or the annual value of the premises, I should, under the circumstances, be unwilling to fix it above the proper proportion of the rent reserved in the lease to Dingee, which should be allowed for this part of the premises. I do not pronounce upon that point definitely, being inclined, if the parties desire it, to award a feigned issue, so as to present all the questions in dispute in this case for trial by a jury. (2 *R. S.*, 3*d ed., p.* 165, § 14.)